**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| LANCE RICHARDSON, | ) | CASE NO. 1:14-CV-2050 |
| | ) | |
| Petitioner, | ) | JUDGE LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| CHRISTOPHER LAROSE, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This 28 U.S.C. § 2254 petition is before the magistrate judge pursuant to Local

Rule 72.2(b)(2).  Before the court is the petition of Lance Richardson ("Richardson" or

"Petitioner"), for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  Petitioner

is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to

journal entry of sentence in the case of *State of Ohio vs. Richardson*, Case No.

2012CR737 (Stark County Aug. 14, 2012).  (Doc. No. 4-1 at Ex. 15.)  For the following

reasons, the magistrate judge recommends that the petition be: (1) DISMISSED with

respect to grounds one and three; and (2) GRANTED with respect to ground two, and,

therefore, this case should be remanded to state court with instructions to retry

Petitioner within a reasonable amount of time.

## I.  Introduction

The state appellate court that affirmed Petitioner's conviction noted the following

facts:

> In December of 2011, Todd Davis placed an ad on Craig's List for a date. A woman named Tiffany responded to his ad and started texting Davis. On January 3, 2012, Tiffany texted Davis wanting to meet him at a bar on the corner of 15th Street and Harrison in Canton.
>
> Davis went to the bar. Tiffany was not there, so he sat at the bar and drank a few sodas. Eventually Tiffany texted Davis, asking him to pick her up at an address in Canton.
>
> Davis arrived at the address Tiffany gave him around 10:30 p.m. At her direction, he parked in a public lot near Aultman Hospital. Tiffany was waiting for him. Davis and Tiffany began walking down an alley where there were apartments. Davis assumed that they were walking to Tiffany's apartment.
>
> A man wearing a hoodie walked up to Tiffany and asked her for a light. He did not have his cigarette with him, and briefly walked away. When he came back, he hit Davis in the head with bottle. While Davis was on the ground, the man kicked him in the face several times, asking for his wallet. At this point, Davis was knocked "totally loo-loo." Tr. 141. Tiffany, whose real name is Maria Likouris, ran away. The man took Davis' cell phone and his wallet. Davis went to Aultman Hospital and was treated for a broken nose and fractured eye socket.
>
> Detective Gary Cochran of the Canton Police Department was assigned to investigate the case. He learned that appellant's Chase credit card was used at a Speedway gas station near the site of the robbery at 11:03 p.m. Video surveillance tapes showed Likouris and a man wearing a black hoodie using Davis' credit card to make purchases. The credit card was then used at 11:43 p.m. in a Giant Eagle grocery store, along with a Giant Eagle Advantage Card belonging to appellant. Likouris and the man in the hoodie were also spotted holding hands on Wal-Mart video surveillance at 3:32 a.m., using Davis' credit card to attempt to purchase American Express gift cards. While in the store,

the pair returned a Wii game for a cash refund, and appellant's name was signed to the receipt.

The video surveillance tapes were shown to Davis. Davis was "pretty sure" that the woman in the videos was the woman he knew as Tiffany. He was not sure if the male in the videos was the man who attacked him. Three days later, Davis viewed a photo lineup that included appellant. On a scale of one to five, with one being certain a photo is not of the perpetrator and five being certain that the photo is of the perpetrator, Davis rated the photo of appellant a three and the remaining five photos as ones.

Det. Cochran interviewed Likouris on February 3, 2012. After waiving her *Miranda* rights, she told Cochran that appellant, who was her boyfriend, set up the meeting with Davis. Appellant asked her for a lighter and the next thing she knew, appellant hit Davis. However, she later told a public defender that appellant attacked Davis in self defense.

*State v. Richardson*, No. 2012CA166, 2013 WL 2243974, *1 (Ohio Ct. App. May 20, 2013).

## II.  State Court Proceedings

### A.    Indictment and Motion to Suppress

In May 2012, the State issued an indictment charging Petitioner with one count each of aggravated robbery and felonious assault.  (Doc. No. 4-1 at Ex. 1.)  In July 2012, Petitioner, through counsel, filed a motion to suppress Davis's identification of Petitioner, arguing that the identification was the product of an impermissibly suggestive method.  (*Id*. at Ex. 5.)  Specifically, Petitioner noted that Davis had identified Petitioner in a photographic line up that occurred subsequent to police officers showing Davis the video surveillance of Petitioner in the gas station and telling Davis that the individual in

3

the video was their suspect.  (*Id*.)[1]

Thereafter, the state trial court conducted a hearing on Petitioner's motion to suppress Davis's identification.  (Suppression Hearing Transcript ("Supp."), Doc. No. 6-1.)  Canton Police Sergeant Gary Cochran testified as follows regarding his investigation of the January 2012 incident and Davis's identification.  Sergeant Cochran developed Petitioner as a suspect after learning that Davis's assailant had used Davis's credit cards at a Wal-Mart, a Speedway gas station and a Giant Eagle grocery store.  Petitioner had used his Giant Eagle Advantage card in association with one of the purchases made using Davis's credit card.  (Supp. at 7.)  Sergeant Cochran obtained surveillance videos of Petitioner using Davis's credit card to make transactions.  (*Id*. at 9.)  He showed Davis surveillance videos from Speedway and Wal-Mart, and asked Davis whether the individual in the videos was the individual who assaulted him.  (*Id*. at 8.)  Davis told Sergeant Cochran that he was not certain.  (*Id*.)  Davis, however, was "pretty sure" that the woman accompanying the man in the videos was the woman involved in the incident.  (*Id*. at 10.)  Four days later, Sergeant Cochran showed Davis a photograph array and asked if Davis could identify his assailant.  (*Id*. at 12.)  Davis identified Petitioner as his assailant, but rated his certainty regarding the identification as only a 3 on a scale of 1 (least certain) to 5 (most certain).  (*Id*. at 12-13.)

In August 2012, the trial court denied the motion to suppress Davis's identification of Petitioner.  (Doc. No. 4-1 at Ex. 7.)  The trial court determined that the

---

[1] Petitioner also moved to suppress statements he made to police officers while in custody.  (Doc. No. 4-1 at Ex. 6.)  The trial court granted that motion, and it is not at issue in this case.

4

identification method was not impermissibly suggestive because Davis was "never able to specifically identify [Petitioner] as the culprit.  The victim assigned the number 3 from a 1 to 5 scale as to his confidence level identifying" Petitioner.  (*Id*.)

**B.    Trial**

At trial, Davis, who did not testify at the suppression hearing, testified as follows.  The assault occurred around 10:30 at night.  (Trial Transcript ("Tr.") at 136, Doc. No. 6-2.)  The parking lot where he met Tiffany was "lit a little bit," but the alley down which they walked together, and where the assault occurred, was "mostly . . . dark."  (*Id*.)  A "black kid" approached the two of them and asked Tiffany for a light.  (*Id*. at 138.)  Davis "couldn't really get a visual identification" of the individual, who was wearing a "[h]oodie, just street clothes."  (*Id*.)  Davis could see the individual's "face a little bit."  (*Id*. at 139.)  Davis watched the individual walk away toward a car, and then walk back toward Davis and Tiffany.  (*Id*.)  As they stood there, Davis thought that Tiffany was waiting for the individual to come back.  (Tr. 140.)  As the individual walked back toward them, Davis "kind of looked up at the light, and I seen a clear bottle come and wham, [hit him] right on the head."  (Tr. 139.)  Davis fell to the ground.  (*Id*.)  The individual kicked and punched Davis while Davis was on the ground, and took Davis's wallet and cell phone.  (Tr. 141-42.)  His wallet contained $60 in cash, a Chase debit card, and credit cards, including a Chase credit card.  (Tr. 143, 153-54.)

With respect to whether he could see his assailant's face, Davis testified that, while he was on the ground, he "was able to look up in the darkness and see [the attacker's] face a little better than that, but I had no light to go on his face."  (Tr. 143.)

Davis described his attacker as "black. His hair was cut kind of short that night. His hair was black ." (Tr. 144.)

Davis reported the attack to the police, and Sergeant Cochran contacted Davis a few days later for an interview regarding the incident. (Tr. 155.) Cochran showed Davis surveillance videos from Speedway[2] and Walmart. (Tr. 156-57.) Davis described the video from Speedway as "a real good video." (Tr. 157.) On January 20, 2012, several days after viewing the videos, another officer showed Davis the photographic line up, which consisted of individual photographs contained in folders. (Tr. at 156-57.) Davis rated his certainty regarding whether the individual in a particular photograph was his assailant on a scale of 1 to 5. (*Id*. at 159.) Davis identified Petitioner as the man who assaulted him, but conceded that his identification of Petitioner was not certain:

> Q: And in that photo lineup did you make an identification, correct?
>
> A: A similarity. I seen one picture that kind of looked similar a little bit, some facials; wasn't, I wasn't interested about but I didn't really weigh it really heavy either, but anything else was not in the file except that one picture.

(Tr. 157.) Davis assigned the first photograph in the lineup a 1, and assigned the second photograph – Petitioner's photograph – a 3, for "middle of the road." (Tr. 159.) Specifically, Davis said that the second photograph "[k]ind of looked like" his assailant, "had some facial features, you know, given an idea of what he looked like and

---

[2] During his testimony, Davis refers to the video from Speedway as having been taken at "Super America." (*See, e.g.,* Tr. 157.) There is no evidence in the record, however, that Davis viewed video from any establishment called Super America. The rest of the record demonstrates that the video to which Davis refers as coming from "Super America" is, in fact, from Speedway.

6

anything."  (*Id*.)  He described the individual in the second photograph as looking "a little bit" like his assailant, "in the eyes a little bit."  (Tr. 160.)

Davis testified that Petitioner – who was sitting at the defense table – "looks like the person" who attacked him, but he couldn't be certain:

> Q:  Well, I mean I got to ask the question.  Do you see the person in the courtroom today that attacked you?
>
> A:  He looks similar but with this picture [the second photograph from the lineup] right here and stuff, it was dark and that.  I just up and say he did it right there if he's the one.  He's changed a little bit since I seen him that night.
>
> Q:  So you're saying the person seated at the defense table, Lance Richardson, looks like the person?
>
> A:  Looks like the person, yeah.  I could probably make a better – I made the best – I made the best pinpoint that was on the videos.  I don't remember – the video was a long time ago.  I seen him in the videos using my credit cards, and that is when I seen him the best.
>
> Q:  But you can't be one hundred percent sure to that; is that what you're saying?
>
> *   *   *
>
> A:  No.

(Tr. 161-62.)

On cross-examination, Davis testified that the alley where he was attacked was dark, and that it was fair to say that he did not get a good look at his attacker.  (Tr. 163.) He agreed that he had been "blind-sided" by the attack.  (*Id*. at 164.)  Davis conceded that he had not mentioned that his assailant was wearing a hoodie when Davis first described his attacker to police:

7

> Q:      Now, today in your testimony I thought you said that
> the person who attacked you was wearing a hoodie of
> some kind.  In fact, you had described the individual
> as wearing a dark coat when you talked with police; is
> that correct?
>
> A:      Yeah.  When he was talking to Tiffany, that's what he
> had on.  When he was talking to Tiffany, that's what
> he had on the first time we talked to him.
>
> Q:      Had the dark coat on?
>
> A:      Yeah; dark coat on and hoodie on.
>
> Q:      Was the individual who attacked you that night
> wearing a hoodie or did you just see the dark coat?
>
> A:      He was wearing a hoodie, yeah.
>
> Q:      And the dark coat?
>
> A:      Well, the dark coat might have been the hoodie, I
> mean.

(Tr. 166-67.)

Davis also testified on cross-examination that Sergeant Cochran instructed him

to "focus" on the two individuals in the surveillance videos.  (*Id.* at 167.)  He reiterated

that he wasn't certain that the photograph to which he had assigned a 3 was a

photograph of his attacker:

> Q:      So it would be fair to say that you weren't certain at
> that point that that photograph of that individual was
> the attacker?
>
> A:      Right.  They wanted me to just pick out photos that
> looked like could possibly be facial features and stuff
> like that –
>
> Q:      Okay.
>
> A:      – and weigh them as I see fit.

8

Q:      So you certainly weren't saying with absolute certainty
        that that was, in fact, your attacker?

A:      Right.

Q:      Just saying that it looked like it might be him?

A:      Right.

Q:      It's possibly him?

A:      Right.

(*Id*. at 168.)  Finally, Davis agreed that he wasn't certain that the individual who

assaulted him was "even in the courtroom." (*Id*. at 170.)

Likouris testified at trial as follows:  Petitioner was her boyfriend.  (Tr. at 182.)

Prior to the incident, Likouris had placed an ad on Craigslist using the name "Tiffany,"

and Davis had contacted her through that ad.  (*Id*. at 183-84.)  She communicated with

Davis using someone else's cell phone.  (*Id*. at 184.)  On the night of the assault, after

she and Davis met in a parking lot, they began walking down an alley to where she was

staying.  (*Id*. at 187.)  They were approached by a man who asked for a lighter.  (*Id*.)

This man, whom Likouris did not know, was the person who attacked Davis.  (*Id*. at

187-88, 192.)  After the attack, Likouris ran away and contacted a friend, who drove her

to the home of Petitioner's sister.  (*Id*. at 196.)  Later that night, Likouris went with

Petitioner to Speedway, where he used a credit card to purchase a gift card.  (*Id*. at

197.)  Likouris identified Petitioner as the individual in the surveillance video making

purchases at Speedway, and conceded that she and Petitioner were at Speedway at

11:01 pm – approximately 30 minutes after the assault.  (*Id*. at 198, 200.)  In addition to

Speedway, she and Petitioner went to Walmart and Giant Eagle.  (*Id*. at 200.)

9

Petitioner used another credit card at Giant Eagle, where he also scanned his Giant Eagle Advantage card.  (*Id.*)  Likouris agreed that they went to Giant Eagle at approximately 11:43 pm, the time reflected on the relevant receipt from that store.  (*Id.*)  When Likouris asked Petitioner where he obtained the credit cards, he told her that someone had sold them to him.  (*Id*. at 202.)

During her direct testimony, Likouris admitted that she had told Sergeant Cochran a different story regarding the night of the assault. (Tr. 184-85.)  Specifically, Likouris admitted that, when she spoke to Sergeant Cochran regarding the assault, she told him that: (1) Petitioner used her e-mail address to communicate with Davis, and had arranged her rendezvous with Davis (*id*. at 184-85, 195-96); and (2) it was Petitioner who approached her and Davis in the alley and that it was Petitioner who attacked Davis (*id*. at 188, 192-93).  She also admitted that when she spoke with Petitioner's public defender, she told the public defender that Petitioner was at the scene of the assault, but that it was Davis who attacked Petitioner.  (*Id*. at 204-05.)

Prior to the close of evidence, Petitioner filed a motion for a jury instruction regarding Likouris's inconsistent statements.  (Doc. No. 4-1 at Ex. 12.)  In the motion, Petitioner requested that the trial court instruct the jury as follows:

> Testimony has been given concerning prior statements that Maria Likouris has allegedly made to police and to counsel for the defendant.
>
> You may not consider these statements as substantive evidence.  Substantive evidence means that evidence which is used for the purpose of discrediting a witness, or of corroborating his or her testimony.  You may therefore not consider statements made by Maria Likouris to others as being statements of what actually occurred on January 3,

> 2012.  Her statements to others are merely evidence that
> you may consider in judging her credibility as a witness in
> this case.

(*Id*.)  Prior to instructing the jury, the trial court notified the parties that it would not use the jury instruction proposed by Petitioner, but indicated, instead, that it would include an instruction drafted by the court.  (Tr. at 275-76, Doc. No. 6-3.)  Petitioner's trial counsel objected.  (Tr. 282.)  Thereafter, the trial court instructed the jury as follows regarding Likouris's testimony:

> You have heard testimony from a Maria Likouris as to the
> events that occurred on the night in question.  Maria Likouris
> also gave a statement to police shortly after the incident
> occurred and a statement to counsel for the Defendant.
> These three statements are inconsistent as to the facts that
> occurred on January 3, 2012.
>
> You *may or may not* consider these statements as
> substantive evidence.  Substantive evidence means
> evidence which is used for the purpose of proving a fact in
> issue as opposed to evidence given for the purpose of
> discrediting a witness or of corroborating his or her
> testimony.
>
> You *may or may not* therefore consider statements made by
> Maria Likouris to others as being a statement of what
> actually occurred on January 3, 2012.  Her statements to
> others are evidence that you may or may not consider in
> judging her credibility as a witness in the case.
>
> You, as triers of fact, may determine which statement to
> believe or disbelieve or may to choose to believe none of the
> statements.

(Tr. 294-95 (emphasis added).)

During closing argument, the State emphasized the fact that Davis had identified Petitioner as his attacker and that Likouris had testified that Petitioner was the individual with her on the surveillance video from Speedway:

11

> Now we heard about the victim. He gives that photo of
> Lance Richardson a 3; *he doesn't say it's not him.* He says
> it looks, you know, has similar features, looks like him, but I
> can't be – you know, I'm not going to give it a 5, I give it a 3,
> okay.
>
> He also describes this person as having a hoodie on, a
> hoodie. The videos, especially the one at the Speedway
> around 11 o'clock; the Defendant, Lance Richardson, is
> seen at the Speedway wearing a hoodie.
>
> And that's Lance Richardson. *Maria Likouris says, Oh,
> that's me and him at the Speedway.* He was using a credit
> card. I didn't ask how he got it. I didn't ask but he's in that
> Speedway wearing a hoodie.

(Tr. 310-11 (emphasis added).) The State characterized much of the evidence,

including Davis's identification of Petitioner, as being direct evidence of Petitioner's

guilt:

> [The] State would submit to you, the Jury, on this date,
> based on all that direct evidence, the videos, the receipts,
> the hoodie, the victim's . . . ID of the Defendant; what
> naturally and logically followed? Did the Defendant
> somehow in this short period of time go and buy a stolen
> credit card? No.

(Tr. 311-12.)

During Petitioner's closing argument, his counsel emphasized that Petitioner's

use of Davis's credit cards was not direct evidence that he had assaulted Davis, and

argued that the State's direct evidence – Likouris's testimony and Davis's identification

– were not sufficient to support a guilty verdict:

> Now, we told you at the outset yesterday that there was no
> dispute that Lance is the person who had tried to use Todd
> Davis's credit cards at Walmart, Speedway and Giant Eagle.
> And there is no dispute that he committed an offense of
> misuse of credit cards or receiving stolen property. That
> makes him guilty of those offenses, but it does not mean

12

automatically, as the State would want you to believe, that he is guilty of felonious assault and aggravated robbery.

* * *

Now, to make that leap then to say that he is automatically the person that robbed and assaulted Todd Davis, the State hasn't met that burden of proof.

Now let's look at the testimony of Maria Likouris.  She testified under oath yesterday that Lance was not the person who committed this crime of felonious assault and armed robbery, aggravated robbery.

She told Sergeant Cochran that it was Lance, and why did she tell Sergeant Cochran back in February that it was Lance?  She clearly believed that she was going to be charged with a crime of either aiding and abetting or complicity, but that she was going to be in serious trouble if she didn't tell Sergeant Cochran what she thought he wanted to hear.

She was obviously in a very vulnerable position that day talking to the police.  So what does she do?  She lies and tells them that Lance Richardson is the person who attacked Todd Davis, and that simply is not the case.

* * *

Now, the identification issue, obviously Todd Davis picked Lance's photo out of a photo lineup on January 20.  He had already seen Lance on video three days before that when Sergeant Cochran showed him the video from Speedway and Walmart, and Sergeant Cochran told him I want you to focus on this individual in the video.

So three days later when they showed Todd Davis a series of photos, well, of course he picks out Lance Richardson, because that's who he recognized from just seeing on the video just three days before.

I mean, was he really saying yes, that is the person who robbed me three weeks earlier on January 3 or was he picking out Lance's photo because he recognized him from three days before when he was shown the video?  And

13

> that's the problem with identification is that the police officers
> by showing the video before any photo lineup tainted this
> identification process.
>
> Now, when the police show you a series of photographs and
> they ask you to pick out the person who most resembles the
> perpetrator, they ask you to rate on a scale of 1 to 5, 1 being
> you're certain that's not the perpetrator, 5 you're certain that
> was the perpetrator, and Todd Davis said number 2, I'm
> going to give him a score of 3.  And he said, the comment I
> believe that Todd Davis made to [the police officer who
> showed him the lineup] at the time was it looks like it might
> be him, it's possibly him.
>
> Todd Davis never said that's definitely the man who robbed
> and attacked him, and even in court yesterday, Todd Davis
> came in and he looked around the courtroom and he said it
> might be him.  I don't know.
>
> So that State of Ohio has not by any stretch of the
> imagination given you an airtight identification, and
> remember it's their burden of proof, not ours.

(Tr. 314-18.)  Petitioner's counsel also emphasized the differences between Davis's

original description of his attacker and Petitioner's actual appearance.[3]  (*Id.* at 319.)

During its rebuttal argument, the State emphasized the fact that, during her

interview with Sergeant Cochran, Likouris identified Petitioner as the individual who had

attacked and robbed Davis.  (Tr. 324.)  The State also characterized Davis's

identification as strong evidence of Petitioner's guilt:

> The ID by Todd Davis, he got beat up in the head.  He did
> his best he could and gave Lance a 3, but he went through
> the photo packs not just once but twice and, both times, both
> times he picked out Lance Richardson and ID'd him as the
> one who looks like the one who assaulted him and took his

---

[3] Specifically, Petitioner's counsel noted that, initially, Davis described his
attacker as having a "medium afro," wearing earrings and being thin, whereas Petitioner
had short hair, no earrings and weighed over 200 pounds.  (Tr. at 319.)

14

wallet.

And let's think of that for a second.  Just come and reason
and think about that.  What are the chances that I pick out a
person that looks like the person that assaults me and then
ends up being the person who has the credit cards; who just
ends up to be the person that is with Maria Likouris, the
woman known as Tiffany who I thought I was meeting on
line?

I mean, what are the chances that day that Lance
Richardson, which is minding his own business, his girlfriend
is meeting another guy, who gets beat up and robbed by
someone else, and Lance just happens to buy the two stolen
credit cards with that who doesn't have a job?  What are the
chances of that story?  There is no chance.

Use your reason and common sense.  The evidence is
clear.  The Defendant was in possession of the credit cards;
using the credit cards in that short time frame right after the
assault.  And the victim does point to him and say yeah, it
sure looks like the guy who did it, and the ex-girlfriend in her
first statement – or girlfriend, sorry, in her first statement
points to him.

(Tr. 325-26.)

After deliberating, the jury convicted Petitioner of both counts in the indictment.

(Doc. No. 4-1 at Ex. 13.)  On August 6, 2012, the trial court sentenced Petitioner to

concurrent terms of imprisonment totaling ten years.  (*Id*. at Ex. 15.)

**C.    Direct Appeal**

Petitioner filed a timely notice of appeal.  (Doc. No. 4-1 at Ex. 16.)  He asserted

the following assignments of error:

> I.     The trial court erred in denying the Appellant's motion
> to suppress the identification of the Appellant due to
> the suggestive nature of the photo lineup.
>
> II.    The trial court erred in failing to give the Appellant's
> requested jury instruction regarding prior inconsistent

15

statements of a material witness.

III.     The Appellant's conviction for one count of
         aggravated robbery in violation of [Ohio Revised
         Code] 2911.01 and one count of felonious assault in
         violation of [Ohio Revised Code] 2903.11 were
         against the manifest weight and sufficiency of the
         evidence.

(*Id*. at Ex. 17.)  In May 2013, the state appellate court affirmed Petitioner's conviction.

*Richardson*, 2013 WL 2243974 at *5.

In June 2013, Petitioner, *pro se*, filed a timely appeal in the Ohio Supreme Court.

(Doc. No. 4-1 at Ex. 21.)  In his memorandum in support of jurisdiction, Petitioner

alleged the following propositions of law:

I.      Whether the court erred in denying appellant's motion
        to suppress the identification of the appellant in their
        de novo review when the confrontation procedure
        was highly suggestive and prejudicial to the Appellant,
        which violated the two prong analysis of *Manson v.
        Brathwaite*, [432 U.S. 98 (1977)].

II.     Whether the court erred in denying appellant's
        request for a jury instruction regarding prior
        inconsistent statements in violation of Evidentiary
        Rule 607.

III.    Whether [there] was insufficient evidence presented
        at trial to convict the Appellant of the charges of
        Felonious Assault and Aggravated Robbery when the
        evidence only showed – at best – guilt of possession
        and misuse of stolen property, violating the due
        process clause in *Jackson v. Virginia*, [43 U.S. 307
        (1979)].

(*Id*. at Ex. 22.)  In September 2013, the Ohio Supreme Court declined jurisdiction and

dismissed the case.  *State v. Richardson*, 994 N.E.2d 465 (Table), 136 Ohio St.3d 1495

(Ohio 2013).

16

### III.  Proceedings in this Court

In September 2014, Petitioner filed his § 2254 petition.  (Doc. No. 1.)  He asserts

the following three grounds for relief:

> I.      Trial courts erred in denying Appellant[']s motion to
>         suppress identification of the photo lineup.
>
> II.     Trial court erred in failing to give the Defendant[']s
>         requested jury instruction regarding prior inconsistent
>         statement.
>
> III.    Manifest weight and sufficiency of the evidence.

(*Id.*)

Thereafter, the State filed its Answer/Return of Writ in this case.  (Doc. No. 4.)

The State argues that Petitioner's first and third grounds lack merit, and that the second

ground is procedurally defaulted.  (*Id.*)  Despite receiving two extensions of time within

which to do so (doc. nos. 8, 11), Petitioner did not file a Traverse in this matter.

### IV. Procedural Issues

**A.      Jurisdiction**

A state prisoner may file a § 2254 petition in "the district court for the district

wherein such person is in custody or in the district court for the district within which the

State court was held which convicted and sentenced him."  28 U.S.C. § 2241(d).  The

Court of Common Pleas of Stark County, Ohio sentenced Petitioner. (Doc. No. 4-1 at

Ex. 15.)  Stark County is within this Court's geographic jurisdiction.  *See* 28 U.S.C.

§ 115(a).  Accordingly, this Court has jurisdiction over Petitioner's § 2254 petition.

**B.      Exhaustion and Procedural Default- Second Ground for Relief (Jury
          Instruction on Likouris's Prior Inconsistent Statements)**

A state prisoner must exhaust all available state remedies or have no remaining

17

state remedies available prior to seeking review of a conviction via federal habeas corpus.  *See* 28 U.S.C. § 2254(b) and (c); *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims.  *See Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).

Here, the State argues that Petitioner failed to fairly present the federal nature of his second ground for relief to the state courts.  In his second ground for relief, Petitioner argues that the trial court erred in failing to give the jury the defense's proposed jury instruction that would have precluded the jury from considering Likouris's prior inconsistent statements as substantive evidence of guilt.  The State contends that Petitioner failed to raise a federal constitutional claim and failed to cite federal constitutional law in support.  Review of Petitioner's state court appellate brief reveals that he cited to only Ohio law and Ohio court rules. He did not cite any federal constitutional law.

Generally, when a petitioner does not rely on federal constitutional law in support of a particular claim in state court, he fails to exhaust the corresponding ground for relief in his § 2254 petition.  In this case, however, Petitioner's failure to rely on federal law in his state court filings does not definitely resolve the question.  In its state appellate court brief, the State conceded that Likouris's prior inconsistent statements did not meet the criteria for admission as substantive evidence under Ohio Rule of Evidence 801, but argued that any error in the court's jury instruction was harmless because there was substantial other evidence to support the verdict.  The state

18

appellate court did not analyze the merits of the jury instruction claim, determining instead that the trial court's instruction was harmless error. *Richardson*, 2013 WL 2243974 at *3.  In its analysis of this issue, the state appellate court cited to two United States Supreme Court cases, *Neder v. United States*, 527 U.S. 1 (1999), and *Chapman v. California*, 386 U.S. 18 (1967), and Ohio Criminal Rule 52(A).  *Richardson*, 2013 WL 2243974 at *3.  In *Neder*, Court concluded that, on direct appeal, an erroneous trial court jury instruction is subject to the harmless error analysis set forth in *Chapman*.  527 U.S. at 10-11.  In *Chapman*, the Court determined that, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  Ohio Criminal Rule 52(A) defines a harmless error as "any error, irregularity, or  variance which does not affect substantial rights."  Ohio R. Crim. P. 52(A).

In its harmless error analysis in this case, the state appellate court pointed to other evidence against Petitioner –  the surveillance videos; Petitioner's use of Davis's credit cards; Likouris's admission that she had met with Davis where Davis was assaulted; the lack of corroboration for Likouris's statement that Petitioner had purchased the stolen credit cards from someone else; and Davis's identification of Petitioner as his assailant – to conclude that error arising out of the jury instruction regarding Likouris's statements was harmless.  *Richardson*, 2013 WL 2243974 at *3.  Because the state appellate court cited to federal constitutional law regarding harmless error, as well as to a state criminal rule that implicates "substantial rights" in its determination of whether an error is harmless, the state appellate court arguably

recognized the constitutional dimension of Petitioner's jury instruction claim.  Despite this, however, Petitioner still failed to exhaust his second ground for relief in state court. Review of his memorandum in support of jurisdiction to the Ohio Supreme Court reveals that, not only did he fail to cite any federal constitutional law in support of the merits of his argument, but he also failed to challenge the state appellate court's harmless error analysis.  Accordingly, Petitioner failed to assert the constitutional dimension of his claim – either on its merits or with respect to whether it resulted in harmless error – to the highest Ohio court, and this claim is not exhausted.

The State contends that Petitioner's second ground for relief is also procedurally defaulted.  If any state procedures for relief remain available after a petitioner has failed to exhaust a particular claim, generally, a federal court must dismiss his petition.  *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  If there are no longer any state court remedies still available to a petitioner with respect to a particular claim, this Court may deem that claim procedurally defaulted.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' *Engle v. Isaac*, 456 U.S. 107, 125, n.28 (1982), it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law,' *Castille*[, 489 U.S. at 351].").

In this case, Petitioner no longer has any remedies available to raise the constitutional nature of his jury instruction claim in state court.  This claim arises out of the record of proceedings in the trial court and, thus, Petitioner could have raised the constitutional nature of the claim on direct appeal.  He failed to do so and, under Ohio

20

law, *res judicata* now prohibits him from raising the issue in any post-conviction

proceeding.  *See State v. Cole*, 443 N.E.2d 169, 171, 2 Ohio St.3d 112, 113 (Ohio

1982); *State v. Perry*, 226 N.E.2d 104, 10 Ohio St.2d 175 (Ohio 1967) (holding that *res*

*judicata* bars a criminal defendant from raising in post-conviction proceedings those

claims that could have been raised on direct appeal).  The Sixth Circuit has determined

that the application of *res judicata* under Ohio law is an independent and adequate

procedural ground.  *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003).  Accordingly,

this claim is procedurally defaulted.

Because he did not file a Traverse in this case, Petitioner offers no argument

regarding cause for his default of this claim.  Nor does he assert any claim of actual

innocence.  Accordingly, there is no basis to excuse Petitioner's procedural default of

this claim.  Petitioner's second ground for relief should be dismissed with prejudice as

procedurally defaulted.

## V.  The Merits of Petitioner's Claims

### A.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ( "AEDPA") altered

the standard of review that a federal court must apply when deciding whether to grant a

writ of habeas corpus.  As amended, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim resulted in a decision that was
> contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the
> Supreme Court of the United States; or resulted in a

> decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State
> court proceeding.

A writ of habeas corpus may issue only if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence. *See Carey v. Musladin*, 549 U.S. 70 (2006); *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000). Law is "clearly established" only by holdings of the Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction. *See Carey*, 549 U.S. at 74.

Courts must give independent meaning to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1):

> Section 2254(d)(1) defines two categories of cases in which
> a state prisoner may obtain federal habeas relief with
> respect to a claim adjudicated on the merits in state court.
> Under the statute, a federal court may grant a writ of habeas
> corpus if the relevant state-court decision was either (1)
> "*contrary to* . . . clearly established Federal law, as
> determined by the Supreme Court of the United States," or
> (2) "*involved an unreasonable application of* . . . clearly
> established Federal law, as determined by the Supreme
> Court of the United States."

*Williams*, 529 U.S. at 404-05 (emphasis added by the quoting court). A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result. *Id.* at 405-06. A decision involves an unreasonable application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to the facts of the case at hand. *See Wiggins v. Smith*, 539

22

U.S. 510, 520 (2003).  "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been objectively unreasonable."  *Id.* at 520-21 (internal citations and quotation marks omitted).

The Supreme Court has not defined what it means for a state court decision to be objectively unreasonable.  If "fairminded jurists could disagree on the correctness of the state court's decision," *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted), the decision is not sufficiently unreasonable to merit habeas relief.  The determination of whether a state court decision was "objectively unreasonable" requires consideration of the extent to which the state court's decision was incorrect:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  In *Yarborough*, the petitioner argued that the state court had unreasonably applied Supreme Court precedent when the state court determined that he was not in custody during his interview with police officers.  The Supreme Court noted that, although some facts supported a finding that the petitioner was in custody at the time of the interview, other facts supported the state

23

court's finding.  *Id.* at 664-65.  These "differing indications" compelled the Court to conclude that "the state court's application of [the relevant] custody standard was reasonable."  *Id.* at 665.

Review of those decisions in which the Supreme Court and the Sixth Circuit have concluded that a state court's application of federal law was objectively unreasonable reveals that a state court's application of relevant precedent must be plainly incorrect to merit relief.  For example, in *Wiggins*, the petitioner, who was convicted of first degree murder and sentenced to death, alleged that he had received ineffective assistance of counsel when his trial counsel failed to sufficiently investigate and present mitigating evidence during the sentencing portion of his state court proceedings.  The state courts, rejecting the petitioner's application for post-conviction relief, determined that the petitioner's counsel had made a deliberate strategic decision to challenge the petitioner's role in the offense rather than focus on his life history.  In making this conclusion, the state courts noted that, under the relevant state law, an offender was not eligible for the death penalty unless there was evidence that he was directly responsible for the victim's death.

In its decision granting the petitioner habeas relief, the Supreme Court noted that even cursory investigation would have revealed that the petitioner had suffered repeated and extreme physical, emotional and sexual abuse throughout his childhood and young adulthood.  The Supreme Court observed that the record revealed trial counsel's failure to thoroughly investigate the potential mitigation evidence "resulted from inattention, not from reasoned strategic judgment."  *Id.* at 525.  The Court noted that, in denying the petitioner's motion for post-conviction relief, the state courts had

presumed that trial counsel's decision not to present the petitioner's life history as part of the mitigation phase was a strategic decision supported by appropriate investigation. *Id*. According to the Court, this presumption was a sufficiently unreasonable application of the governing principles of *Strickland v. Washington*, 466 U.S. 668 (1984), to merit relief:

> The Maryland Court of Appeals' application of *Strickland*'s governing legal principles was objectively unreasonable. Though the state court acknowledged petitioner's claim that counsel's failure to prepare a social history "did not meet the minimum standards of the profession," the court did not conduct an assessment of whether the decision to cease all investigation upon obtaining the [pre-sentence investigation report and other records reflecting childhood abuse] actually demonstrated reasonable professional judgment. The state court merely assumed that the investigation was adequate. In light of what the [relevant] records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible. The Court of Appeals' assumption that the investigation was adequate thus reflected an unreasonable application of *Strickland*.  As a result, the court's subsequent deference to counsel's strategic decision not "to present every conceivable mitigation defense," despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation, was also objectively unreasonable.

*Wiggins*, 539 U.S. at 527 (internal citations omitted).

The Sixth Circuit has found the requisite level of unreasonableness to grant habeas relief where the state courts either entirely failed to engage in the required analysis or relied on inapplicable case law to support its conclusion. For example, in *Moore v. Haviland*, 531 F.3d 393, 402-03 (6th Cir. 2008), during his state court trial, the petitioner twice timely asserted his right to self-representation and requested that his

25

appointed counsel be dismissed.  Rather than engage in a colloquy to address the

petitioner's request to represent himself, as required by *Faretta v. California*, 422 U.S.

806 (1975), the state trial court delayed its consideration of the issue until after his

appointed counsel called the petitioner for direct examination. In its decision affirming

his conviction, the state appellate court relied on *McKaskle v. Wiggins*, 465 U.S. 168

(1984) – a case that addresses a different issue and, thus, that was inapplicable to the

petitioner's claims – to determine that the petitioner's claim lacked merit.  The Sixth

Circuit concluded that both state court decisions were objectively unreasonable:

> [T]he trial court flat-out failed to exercise its discretion and
> ultimately did not rule on [the petitioner's request to
> represent himself], but let the issue go by default instead.
> Such failure to make a ruling on a criminal defendant's
> unequivocal request to proceed pro se was objectively
> unreasonable in light of *Faretta*.
>
> Contrary to . . . the state appellate court's analysis,
> [*McKaskle*] is not on point here. . . . For the state court to
> read *McKaskle* to find a waiver of [the petitioner's] right to
> self-representation was an objectively unreasonable
> application of that decision.

*Moore*, 531 F.3d at 403.

Although neither the Supreme Court nor the Sixth Circuit has explicitly described

what constitutes an objectively unreasonable application of federal law, review of these

decisions reveals that, in order to merit habeas relief on the basis of an unreasonable

application of federal law, a state court's decision must involve more than a

questionable interpretation of a fact or a controversial application of the relevant law.

Rather, in order to merit habeas relief, a state court's decision must involve a clear

mistake, such as incorrect or incomplete analysis, or the failure to consider relevant

facts in the record, that results in a constitutional violation.  *See, e.g., Miller v. Straub*, 299 F.3d 570, 580-81 (6th Cir. 2002) (state court's application of *Strickland* and *Hill v. Lockhart*, 474 U.S. 52 (1985) was objectively unreasonable when the state court determined that the petitioner's counsel was not constitutionally deficient despite advising the petitioner, a 15-year old who was charged with murder, to plead guilty and accept sentencing as a juvenile, without considering that the state could appeal the imposition of the juvenile sentence; and, if successful, subject the petitioner to a sentence of life imprisonment as an adult)*; McGraw v. Holland*, 257 F.3d 513, 517-18 (6th Cir. 2001) (state court's application of *Miranda* was objectively unreasonable where state court trial court found that admission of defendant's statements made after she asserted that she "did not want to talk about" the crime at issue did not constitute requests not to talk about the offense).  The court applies this deferential standard of review to Petitioner's claims in this case.

**B.     First Ground for Relief - Photographic Lineup**

In his first ground for relief, Petitioner contends that the trial court erred in failing to suppress Davis's identification of Petitioner from the photographic array shown to Davis by Sergeant Cochran.[4]  Due process prohibits the admission of identification evidence that is the product of an unnecessarily suggestive identification procedure.  *Neil v. Biggers*, 409 U.S. 188, 198 (1972) ("Suggestive [identification] confrontations are

---

[4] Petitioner's habeas petition does not contain any argument regarding the merits of his grounds for relief.  Further, despite receiving two extensions of time within which to do so, Petitioner failed to file a Traverse in this case.  Accordingly, the magistrate judge relied upon Petitioner's state court filings to construe Petitioner's arguments in this matter.

disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous.").  An identification violates a defendant's right to due process where the procedure was so unnecessarily suggestive that it created the risk of "irreparable mistaken identification."  *Id*.

The standard for excluding identification evidence requires consideration of two issues: first, whether the identification procedure was unnecessarily suggestive; and, second, if so, whether the identification was nonetheless reliable.  *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005).  The party seeking to exclude the identification evidence bears the burden of showing that the procedure was unnecessarily suggestive.  *Id*. at 469-70.  If the identification procedure was unnecessarily suggestive, a reviewing court must determine whether the identification was nonetheless reliable by considering the totality of the circumstances, including:

> [(1)] the opportunity of the witness to view the criminal at the time of the crime, [(2)] the witness' degree of attention, [(3)] the accuracy of the witness' prior description of the criminal, [(4)] the level of certainty demonstrated by the witness at the confrontation, and [(5)] the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.  "[R]eliability is the linchpin in determining the admissibility of identification testimony."  *Mason v. Brathwaite*, 432 U.S. 98, 114 (1977).

## 1. Unreasonable Application

In this case, the state court decisions regarding the admissibility of Davis's identification constitute objectively unreasonable applications of *Biggers* because the state courts entirely failed to engage in the correct analysis.  In its decision denying

28

Petitioner's motion to suppress, the state trial court focused only on Davis's level of

certainty in making the identification to determine that the identification was admissible.

(Doc. No. 4-1 at Ex. 7.)  In its decision affirming Petitioner's conviction, the state

appellate court relied on the same reasoning, focusing solely upon the uncertainty of

Davis's identification to conclude that the identification was admissible:

> Davis was shown the videotape several days before the
> photo lineup. He was unable to identify the man in the
> videotape as the man who assaulted him, although he was
> "pretty sure" the woman in the videotape was the woman he
> knew as Tiffany. However, when Davis viewed the photos,
> he was still only able to assign a number of three out of five
> to his certainty that appellant was the man who assaulted
> him. As the trial court noted at the end of the suppression
> hearing, "So if the officer was suggesting something, he
> didn't suggest it well because it was a 1 out of – it was a 3
> out of 5, you know what I'm saying?" Tr. Supp. 46. The
> nebulous identification of appellant by Davis went to the
> weight of the evidence, not its admissibility. There is nothing
> in the evidence presented at the suppression hearing to
> indicate that the identification in the photo lineup was in any
> way tainted by the videotape.

*Richardson*, 2013 WL 2243974 at * 18.

Although the state appellate court correctly identified a portion of the correct

legal principle – whether Davis's identification of Petitioner was the product of an

impermissibly suggestive procedure  – it failed to engage in the full inquiry required by

Supreme Court precedent in this context.  Rather than, first, determining whether the

identification procedure was impermissibly suggestive and, second, if so, applying the

*Biggers* factors to determine whether the identification was independently reliable, the

state court collapsed the two inquiries into one step, and considered only the level of

certainty Davis expressed in making the identification.  Based on this single factor

29

(which, under *Biggers*, is relevant to the reliability of the identification rather than the suggestiveness of the procedure), the state appellate court determined that the identification procedure was not impermissibly suggestive.

The errors in the state court's analysis are clear.  In focusing on the certainty of Davis's identification, the state appellate court bypassed the issue of whether the identification procedure was impermissibly suggestive.  Further, and perhaps more egregious, by relying on Davis's uncertainty as the sole basis for allowing his identification testimony into evidence, the state court entirely failed to consider the reliability of that identification –  the "linchpin" in determining admissibility in this context.  Indeed, the record reveals that, during the hearing on the motion to suppress the identification, the State did not adduce evidence relevant either to the specific details of the identification procedure or to the other *Biggers* factors in this case.  For example, the state trial court did not review the surveillance footage that Davis viewed prior to the photographic lineup in this case.  Nor did it view the photographic lineup itself.  Rather, the trial court saw only a single snap shot from one of the surveillance feeds.  (Supp. at 9.)  Further, Davis did not testify at the hearing, and the trial court received no evidence regarding Davis's opportunity to view his assailant or his degree of attention to his attacker during the assault.  The State did not offer any evidence to rebut the suggestion that the identification procedure was impermissibly suggestive.  In other words, based on the record of the suppression hearing, the state appellate court had little evidence to use in determining whether the identification procedure was impermissibly suggestive, and no evidence by which to consider at least three of the five factors identified in *Biggers*.  Thus, the state court failed to engage in the analysis

30

required by relevant federal constitutional law in this context.

The effect of the state cour's errors is apparent.  Under the state court's reasoning, any identification would be admissible in a criminal trial so long as the individual giving the identification was less than completely certain in identifying the defendant as the guilty party.  This reasoning clearly departs from Supreme Court precedent in this context, as it gives no consideration either to the suggestiveness of the procedure or to the independent reliability of the identification.

Further, in this case, the state courts unreasonable application of federal law resulted in a constitutional violation.  With respect to the first step of the correct analysis, federal courts have determined that an identification procedure is impermissibly suggestive when circumstances permit the inference that the individual offered for identification is the perpetrator of the relevant crime.  The classic example of this situation is the "one man show-up," where witnesses view the defendant outside the context of a lineup before identifying him.  *See, e.g., Stovall v. Denno*, 388 U.S. 293, 302 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned.").  In *United States v. De Leon-Quinones*, 588 F.3d 748 (1st Cir. 2009), witnesses to a bank robbery identified the defendant as the robber after seeing him being led into the courtroom in handcuffs.  The First Circuit reasoned that the situation could be "likened to a 'one man show-up,' a classically suggestive identification procedure."  *Id*. at 754.

Here, the suggestiveness of the procedure used to obtain Davis's identification of Petitioner is akin to the suggestiveness of a one-man show-up.  Davis was first confronted with an image of Petitioner when he viewed video surveillance of Petitioner

31

and Likouris using his credit cards at Walmart and Speedway.  He testified at trial that

Sergeant Cochran told him to "focus" on Petitioner while viewing the videos.  (Tr. at

167.)  The surveillance videos were admitted into evidence at trial.  The Walmart video

generally does not provide an unobstructed view of Petitioner's face.  (*See* State's Trial

Exhibit 3, Doc. no. 13.)[5]  The Speedway video, however, provides multiple views of

Petitioner's face, some of which last for greater than 10 seconds.  At trial, Davis

referred to the Speedway video as "a real good video."  (Tr. 157.)  At the suppression

hearing, Cochran described the Speedway video as "even clearer" than the photo from

the video feed (Supp. at 10.)  At the time that he viewed the surveillance videos, Davis

could not identify Petitioner as his attacker.  (Supp. Tr. at 8.)  Several days after viewing

these videos, however, Davis viewed a photographic lineup and identified Petitioner as

his attacker.  By showing Davis videos of Petitioner using his credit cards and

instructing Davis to focus on Petitioner, police officers suggested to Davis that

Petitioner was his assailant.  Davis's trial testimony demonstrates that his viewing of the

videos affected his identification of Petitioner. In response to questioning regarding his

in-court identification of Petitioner (which was far from certain), Davis responded,

---

[5] Upon request by this Court, the State submitted: (1) the photograph from the
Speedway surveillance feed that was viewed by the trial court during the suppression
hearing; (2) the photographic lineup viewed by Davis and offered into evidence at trial;
and (3) the two surveillance videos viewed by Davis and offered into evidence during
trial.  (Doc. Nos. 12-14.)  The Walmart surveillance video is on a CD that the magistrate
judge will forward to the district court judge.  The Speedway surveillance video is also
on a CD.  The program necessary to view the video feed, however, is difficult to use
without some instruction from an information technology ("IT") specialist and requires
the transfer of files to a computer.  The Court's IT department has assisted this Court in
viewing the videos.  A single photograph taken from the Speedway surveillance feed –
the same photograph viewed by the trial court during the suppression hearing – is
attached hereto as Appendix A.

"Looks like the person, yeah. . . . I made the best pinpoint that was on the videos. . . . I seen him in the videos using my credit cards, and that is when I seen him the best." (Tr. 161-62.)  Based on all of these facts, the state trial and appellate courts' application of federal law was objectively unreasonable, and the police identification procedure employed in this case was impermissibly suggestive.

With respect to the second inquiry in this context, applying the *Biggers* factors reveals that Davis's identification was not independently reliable.  Davis's trial testimony shows that he did not have a lengthy opportunity to view his assailant's face.  Nor did he indicate that he paid a great degree of attention to his assailant prior to or during the attack.  Rather, Davis's testimony shows that the attack occurred in a "mostly . . . dark" alley, and that Davis "couldn't really get a visual identification" of the individual who would eventually assault him.  (Tr. 138, 139.)  He could see the individual's face only "a little bit."  (Tr. 139.)  Davis said that he was "blind sided" by the attack.  (Tr.164.) Further, Davis's identification of Petitioner from the photographic line-up was not certain, as he rated it only a 3 out of 5, or "middle of the road."  (Tr. 157-59.)  Based on the factors set forth in *Biggers*, Davis's identification of Petitioner was entirely lacking in any independent indicia of reliability.  The admission of Davis's identification testimony was a violation of due process.

Here, the state courts clearly failed to engage in the correct analysis of Petitioner's claim that Davis's out-of-court identification was not sufficiently reliable to be admitted into evidence, and resulted in the admission of identification evidence that: (1) was the product of an impermissibly suggestive identification procedure; and (2) was not otherwise independently reliable.  Accordingly, this case is not one, like

*Yarborough*, in which the state court decision is supported by some facts but not others such that fairminded jurists could disagree about the correctness of the decision. Rather, in this case, as in *Wiggins* and *Moore*, the state court entirely failed to engage in the correct analysis of Petitioner's claim regarding the admissibility of Davis's identification.  In this case, as in those cases, the state courts' complete failure to engage in the correct analysis constitutes an objectively unreasonable application of established federal law.

### 2.    Prejudice and Sufficiency of the Evidence (Ground Three)

Even where there is a constitutional error in a state-court proceeding, a petitioner is not entitled to habeas relief unless he can show that the constitutional error had a "'substantial and injurious effect on the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).  There is no presumption against the finding of prejudice.  Rather, even "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless.  And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted).

Here, the trial court's admission of Davis's testimony creates at least some doubt regarding whether the error had a "substantial and injurious effect on the jury's verdict" in this case.  Review of the closing arguments made by counsel reveals that Davis's identification played a large role in each sides' theory of the case.  The State emphasized that Davis had identified Petitioner as his assailant, and minimized the

importance of Davis's level of uncertainty: "Now we heard about the victim.  He gives that photo of Lance Richardson a 3; *he doesn't say it's not him*."  (Tr. 310 (emphasis added).)

Petitioner's entire theory of the defense was to concede that he had used Davis's credit cards (as shown on the videos), and to contest that he was the individual who attacked Davis.  Davis's improperly admitted identification testimony was one of only two sources of direct evidence supporting the felonious assault and aggravated burglary charges against Petitioner.  The only other direct evidence was Likouris's testimony that she had initially told police officers that Petitioner attacked Davis.  The State conceded on appeal – and does not argue otherwise in this Court – that the state trial court improperly permitted the jury to consider Likouris's prior inconsistent statements as substantive evidence of guilt.  In other words, the only sources of direct evidence against Petitioner in this case were both improperly admitted.  Further, the state appellate court relied on Davis's identification testimony as part of the basis for finding that the trial court's error with respect to Likouris's testimony was harmless:

> The error in the judge's instruction was harmless in the instant case. Video surveillance tapes show appellant using Davis' credit cards shortly after the robbery and in an area near the site of the robbery. Appellant used his own Giant Eagle advantage card along with the credit card stolen from Davis, and signed a receipt at Wal-Mart using his own name on the same visit where he used a card stolen from Davis. Likouris admitted to posing as "Tiffany" and taking Davis to the spot where he was robbed, although her statements varied concerning the identity of the attacker. There is no evidence to corroborate her new statement at trial that appellant purchased the stolen credit cards from someone else before they began going from store to store using the cards. *Although Davis could not identify appellant as the man who attacked him with certainty, he could identify him*

35

> *by a three on a scale of five.* There is sufficient evidence
> independent of the prior statements by Likouris from which
> the jury could have concluded that appellant was the man
> who attacked and robbed Davis. The error in the instruction
> was therefore harmless.

*Richardson*, 2014 WL 2243974 at ¶ 26 (emphasis added).  Although circumstantial

evidence arguably supported Petitioner's conviction, the improper admission of Davis's

unreliable identification – particularly in light of the improper admission of Likouris's

statements as substantive evidence of guilt – had a substantial and injurious effect on

the jury's verdict in this case.  Accordingly, the petition should be granted with respect

to Petitioner's second ground for relief.

In his third ground for relief, Petitioner challenges the sufficiency of the evidence

supporting his conviction.  Sufficiency of the evidence is different from a determination

that inadmissible evidence had a substantial and injurious effect on the jury's verdict.

While the jury may have reached a different result in this case if it did not consider

inadmissible evidence, such a result is not required.  The standard for overturning a

conviction on the ground that there was insufficient evidence is whether,  "after viewing

the evidence in the light most favorable to the prosecution, [no] rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ; *Scott v. Mitchell,* 209 F.3d 854, 885 (6th

Cir. 2000).  In this case, even absent the improperly admitted direct evidence of

Petitioner's guilt, sufficient circumstantial evidence existed to support a conviction.  As

the state appellate court observed:

> The State presented evidence that Likouris used the name
> "Tiffany" to respond to an ad appellant placed on Craig's list.
> She directed him to meet her in a public parking lot, and led

36

him down an alley toward what Davis thought was her
apartment. In the alley, she was approached by a man who
asked her for a "light." The man hit Davis with a bottle,
kicked and beat Davis, and took his wallet and cell phone.
During the attack, the man referred to Davis as "Dave."

* * *

Davis was attacked around 10:30 p.m., and video tapes
showed appellant and Likouris using the stolen credit cards
at three places near the scene of the robbery almost
immediately thereafter: Speedway at 11:00 p.m., Giant
Eagle at 11:42 p.m., and Wal–Mart at 3:32 a.m. The credit
cards were later found at a doctor's office around the corner
from the place where appellant and Likouris were staying.

Richardson, 2013 WL 2243974 at ¶ 32.  The state courts properly analyzed Petitioner's

claim regarding the sufficiency of the evidence in support of his conviction.  Accordingly,

Petitioner's third ground for relief presents no basis for habeas relief in this case, and

should be dismissed.[6]

---

[6] In his third ground for relief, Petitioner also asserts that his conviction was
against the manifest weight of the evidence.   A petitioner's independent claim that his
conviction was against the manifest weight of the evidence is not cognizable on federal
habeas review.  Johnson v. Konteh, 597 F. Supp. 2d 747, 754 (N.D. Ohio 2009) (citing
Herrera v. Collins, 506 U.S. 390, 401-02 (1993)).  Accordingly, this ground for relief
should be dismissed in its entirety.

**VI. Conclusion**.

For the reasons given above, the petition should be: (1) DISMISSED with

respect to grounds one and three; and (2) GRANTED with respect to ground two, and,

therefore, this case should be remanded to state court with instructions to retry

Petitioner within a reasonable amount of time.


Date: December 3, 2015                         /s/ Nancy A. Vecchiarelli
                                               United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the
Clerk of Courts within fourteen (14) days after the party objecting has been
served with a copy of this Report and Recommendation.  Failure to file objections
within the specified time may waive the right to appeal the District Court's order.
See United States v. Walters, 638 F.2d 947 (6th Cir. 1981).  See also Thomas v.
Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111.**

**Appendix A**



Speedway 9758
Canton, OH
01/03/12 11:02:25p
Primary POS C